# Exhibit 7

**This decision notice has been referred to the Upper Tribunal to determine, in the case of the decision to impose a disciplinary sanction: what (if any) the appropriate action is for the Authority to take, and remit the matter to the Authority with such directions as the Tribunal considers appropriate; and in relation to the prohibition order: whether to dismiss the reference or remit it to the Authority with a direction to reconsider and reach a decision in accordance with the findings of the Tribunal.**



12 Endeavour Square
London
E20 1JN

Tel:   +44 (0)20 7066 1000
Fax:   +44 (0)20 7066 1099
www.fca.org.uk

---

**DECISION NOTICE**

---

**To:   Nailesh Manubhai Teraiya**

**IRN:  NXT01116**

**Date: 22 September 2023**

**1.      ACTION**

1.1      For the reasons given in this Decision Notice, the Authority has decided to:

   a)   impose on Nailesh Manubhai Teraiya a financial penalty of £5,951,754 pursuant to section 67 of the Act; and

   b)   make an order prohibiting Mr Teraiya from performing any function in relation to any regulated activities carried on by an authorised or exempt person, or exempt professional firm pursuant to section 56 of the Act.

## 2.    SUMMARY OF REASONS

2.1    As sole controller and chief executive of ISL during the Relevant Period, Mr Teraiya presided over the participation by it in an equities trading strategy which resulted in claims upon the Danish exchequer, based on misleading documents produced by ISL, amounting to €91.247m.

2.2    Mr Teraiya decided that ISL would provide clearing and custody services in respect of the Trading Strategy, knowing that it would not involve any genuine trades, nor result in any dividends being received by customers of ISL.

2.3    The Trading Strategy purported to be a dividend arbitrage equity trading strategy aimed at minimising tax liabilities on Danish equities by transferring them temporarily to US Pension Plans. The Authority considers that it was not a genuine trading strategy but a mechanism for producing a document, known as a Dividend Credit Advice Slip ("DCAS"), falsely certifying that the US Pension Plans owned large quantities of Danish shares, that dividends had been received by the US Pension Plans and that tax had been withheld by the issuer on behalf of the Danish authorities. Those DCASs, in turn, would support inappropriate applications to the Danish exchequer to reclaim dividend tax.

2.4    On 11 December 2013, Mr Teraiya applied to the Authority on behalf of ISL for a variation of ISL's Part 4A permission in order to enable it to carry out custody and clearing services and, in doing so, made misleading statements about the nature of the business he had decided to conduct. He either knew these statements were misleading at the time, or deliberately failed to correct them before the variation was granted on 7 March 2014.

2.5    Between 14 March and 7 August 2014, ISL purported to settle cum-dividend equity trades in Danish equities on behalf of its Clients to the value of £15.7 billion. These were not genuine trades. Had they been, they would have represented up to 13.6% of the shares outstanding in the companies listed on the Danish Stock Exchange and they would have equated to an average of 26 times the total number of all shares traded in those stocks on European exchanges.

2.6    Mr Teraiya supervised the onboarding of the US Pension Plans to participate in the Trading Strategy, knowing that they were far too small to finance the trades envisaged by the strategy. Furthermore, he understood that the Intermediaries, who were also onboarded as ISL Clients, had no realistic prospect of finding sufficient shares in the market to fill them.

2.7    As clearer, it was fundamental to ISL's role to verify the availability of sufficient funds or shares that would enable trade settlement between buyers and sellers. Mr Teraiya allowed clearance and approval of purported equity trades, knowing they were not genuine, and that if they had been, the Clients concerned had insufficient funds or shares to complete them. At times, particularly in the initial phase of the trading, he had personal conduct of that clearing and approval process.

2.8    From the outset, Mr Teraiya understood that the Purported Trading would proceed in a predetermined, circular and centrally-controlled pattern, such that the trades netted off to zero without any money or shares changing hands. Mr Teraiya knew that no dividend payments were received by ISL, or notified to ISL in its purported role as custodian.

2.9    Accordingly, the Authority considers that Mr Teraiya knew the Purported Trades were not real and that he understood the contracts purportedly agreed between the parties, including those for custodian services, were contrived and were never intended to create genuinely enforceable rights and obligations.

2.10    Mr Teraiya instructed ISL staff to send DCASs to those with conduct of the Purported Trading, despite being aware that the details in them – most crucially the large sums in tax purportedly withheld on behalf of the Danish exchequer – were false. He knew that the DCASs provided a basis for specialised tax reclaim agents to apply, on behalf of ISL Clients, to reclaim significant sums of supposedly withheld tax from the tax agency in Denmark. These reclaim agents, rather than ISL, sent the DCASs to the tax agency in Denmark.

2.11    He also knew that Withholding Tax ("WHT") reclaim monies of €91.247m so obtained from the Danish exchequer were received by ISL. Furthermore, on instruction from the Investment Managers, Mr Teraiya personally ensured that the vast proportion of this money was relayed not to the Clients from which the tax had purportedly been withheld, but to third parties. The Authority considers this was because he already understood the Tax Reclaim Funds were to be distributed as profits among those who introduced or had conduct of the Trading Strategy.

2.12    Furthermore, Mr Teraiya stood to profit substantially from this course of conduct:

    a)    ISL took significant sums via transaction and brokerage fees; Mr Teraiya was, at the time, ISL's sole shareholder.

b)      Over €44m of the reclaimed funds were forwarded to an entity in which an individual closely connected to Mr Teraiya had a controlling interest. That individual then paid the equivalent of £2,983,000 for the purchase of a house for Mr Teraiya in Dubai. Subsequently, that same individual personally transferred more than USD2.5m to accounts controlled by Mr Teraiya.

c)      In addition, more than USD3.5m was paid by the entity controlled by that individual to accounts controlled by Mr Teraiya.

2.13    The Authority considers that Mr Teraiya's conduct was dishonest and lacked integrity and so breached Statement of Principle 1. Mr Teraiya breached Statement of Principle 1 as he acted deliberately and in order to profit personally.

2.14    Mr Teraiya also sought to mislead the Authority regarding the extent to which he personally profited as a result of the Purported Trading. This further indicates his lack of honesty and integrity.

2.15    By reason of his lack of honesty and integrity, the Authority considers that Mr Teraiya is not a fit and proper person to perform any function in relation to any regulated activities.

2.16    The Authority has therefore decided to: (i) impose on Mr Teraiya a financial penalty of £5,951,754 pursuant to section 66 of the Act; and (ii) make an order prohibiting Mr Teraiya from performing any function in relation to any regulated activities carried on by an authorised or exempt person or exempt professional firm pursuant to section 56 of the Act.

## 3.     DEFINITIONS

3.1     The definitions below are used in this Notice:

"401(k) Pension Plan" means an employer-sponsored retirement plan in the United States. In respect of the 2014 tax year, the annual contribution limit was USD17,500 for an employee, plus an additional USD5,500 catch-up contribution for those aged 50 and over. For the tax year 2015, the contribution limits were USD18,000 for an employee and the catch-up contribution was USD6,000;

"the Act" means the Financial Services and Markets Act 2000;

"Authority" means the body corporate previously known as the Financial Services Authority and renamed on 1 April 2013 as the Financial Conduct Authority;

"Cash Equity Broker" means the entity which purported to execute cash equity trades, as part of the Purported Trading, for clearing and settlement by ISL;

"clearer" means an entity which sits between two contracting parties and ensures the terms of a contract, established by a trade and its confirmation, are fulfilled by the settlement process. The process typically validates the availability of the appropriate funds, ensures the delivery of the securities in exchange for cash as agreed at the point the trade was executed, and records the transfer. 'Clearing' is the process of ensuring that the terms of a contract, established by a trade and its confirmation, are fulfilled by the settlement process;

"Clients" means the US Pension Plans, the Offshore Entities and the Intermediaries onboarded by ISL which engaged in the Trading;

"cum-dividend", in relation to a security, means a buyer is entitled to receive the next dividend scheduled for distribution, which has been declared but not paid. A stock trades cum-dividend up until the ex-dividend date, after which the stock trades without its dividend rights;

"Cum-Dividend Trading" means a sequence of cash equity trades which purported to transfer ownership of very large quantities of Danish equities to US-domiciled Pension Plans (mirrored by equal and opposite stock lending trades) at a point in time when a dividend in the relevant Danish equity had been declared but not paid;

"custody" means the safekeeping and administration of client assets;

"DCAS" means Dividend Credit Advice Slip. These are completed and submitted to overseas tax authorities in order to reclaim the tax paid on dividends received;

"DEPP" means the Authority's Decision Procedure and Penalties Manual;

"dividend arbitrage" means the practice of placing shares in an alternative tax jurisdiction around dividend dates with the aim of minimising WHT, or generating WHT reclaims. Dividend arbitrage may include several different activities including trading and lending equities and trading derivatives, including futures and total return swaps, designed to hedge movements in the price of the securities over the dividend dates;

"DKK" means Danish Kroner;

"Double Taxation Treaty" means a treaty entered into between the country where

5

a share dividend is paid and the country of residence of the recipient of that dividend which allows for a reduction or rebate of the applicable WHT;

"Dubai Individuals" has the meaning set out in paragraph 4.23;

"the Equality Act" means the Equality Act 2010;

"European exchanges" means registered execution venues, including regulated markets, multilateral trading facilities, organised trading facilities and alternative trading systems encapsulated in Bloomberg's European Composite;
"First Receiving Entity" has the meaning set out in paragraph 4.66;

"FIT" means the part of the Authority's Handbook entitled "The Fit and Proper test for Employees and Senior Personnel";

"Forward Intermediary" means the entity which participated in purported derivative transactions, in the form of forwards contracts, with the US Pension Plans and the Offshore Entities;

"GMLSA" means Global Master Securities Lending Agreement;

"the Intermediaries" means the Stock Lending Intermediary and the Forward Intermediary;

the "Investment Managers" means the two individuals purportedly authorised to trade on behalf of the US Pension Plans;

"ISL" means Indigo Global Partners Limited (formerly known as Indigo Securities Limited) (in liquidation) with Firm Reference Number 489448;

"Offshore Entity" means one of the entities, domiciled outside the UK, which participated with the US Pension Plans in purported cash equity, forward and stock lending transactions;

"omnibus account" means a bookkeeping system or application which pools the custodian's client positions into one account rather than having a distinct account for each client. In modern equity markets, investors' securities are held in dematerialised form (i.e. electronic form rather than paper certificates), at a prime broker or custodian, typically in an omnibus account;

"OTC" means over the counter trading, which does not take place on a regulated

6

exchange;

"Purported Trades" means trades undertaken as part of the Purported Trading;

"Purported Trading" means the trading of cash equities, stock loans and forwards pursuant to the Trading Strategy. The Purported Trading can be broken into two phases: (i) the Cum-Dividend Trading and (ii) the Unwind Trading;

"RDC" means the Regulatory Decisions Committee of the Authority (see further at paragraph 7.3 below);

"Relevant Period" means the period from 11 December 2013 to 29 January 2015;

"Second Receiving Entity" has the meaning set out in paragraph 4.76;

"share custodian" or "custodian" means an entity which is responsible for safekeeping and administration of share assets on behalf of clients. In particular, it should reconcile cash and stock it holds in its internal accounts with external security depositories, such as its own account at a central securities depository or its accounts across a sub-custodian network and any other bank accounts it holds. Trades should also be instructed and reconciled through the custody holding chain. This is to ensure that record keeping can be maintained, allowing the payment of dividends, shareholder voting, and numerous other asset servicing tasks to occur correctly;

"shares outstanding" means the amount of a company's stock currently held by all its shareholders, including share blocks held by institutional investors and restricted shares owned by the company's officers and insiders;

"SKAT Litigation" means *Skatteforvaltningen v Solo Capital Partners LLP (in special administration) and others [Case Nos: CL-2018-000297, CL-2018-000404, CL-2018-000590, CL-2019-000487 & CL-2020-000369 (Consolidated Claims)]*;

"Statement of Principle 1" means Statement of Principle 1 of the Authority's Statements of Principle for Approved Persons;

"Stock Lending Intermediary" means the entity which participated in purported stock lending transactions with the US Pension Plans and the Offshore Entities;

"sub-custodian" means a share custodian which is a client of a local centralised securities depository ("CSD"), through which another share custodian (which is not such a client) may arrange to hold assets in the CSD;

"Tax Reclaim Funds" means the money relayed to ISL via tax reclaim agents from the Danish exchequer;

"the Trading Strategy" means the purported dividend arbitrage strategy introduced to Mr Teraiya and ISL in 2013;

"the Tribunal" means the Upper Tribunal (Tax and Chancery Chamber);

"Unwind Trading" means a sequence of trades which purported to reverse the Cum-Dividend Trading and transfer those Danish equities back to their previous owners, in such a way that parties on both sides returned to the positions they occupied immediately prior to the Cum-Dividend Trading;

"USA Individual" has the meaning set out in paragraph 4.23;

"USD" means United States dollars;

"US Pensions Plan" means a 401(k) Pension Plan onboarded by ISL and which participated in the Purported Trading;

"Warning Notice" means the Warning Notice dated 4 June 2020 given to Mr Teraiya; and

"Withholding Tax" or "WHT" means a levy deducted at source from income and passed to the government by the entity paying it. Many securities pay periodic income in the form of dividends or interest, and local tax regulations often impose a WHT on such income.

4.    **FACTS AND MATTERS**

**Mr Teraiya's central role at ISL**

4.1    ISL was founded by Mr Teraiya as a small independent brokerage on 25 July 2008 and authorised by the Authority on 2 January 2009. Mr Teraiya was the sole owner

and controller of the business throughout the Relevant Period and held the following controlled functions:

a)    CF3 (Chief executive);

b)    CF1 (Director);

c)    CF10 (Compliance Oversight) until 1 September 2014;

d)    CF11 (Money Laundering Reporting) until 1 September 2014;

e)    CF10a (CASS Operational Oversight) until 10 September 2014; and

f)    CF30 (Customer).

4.2    Mr Teraiya was also the holder of the senior management functions of SMF1 (Chief executive) and SMF 3 (Executive director) at ISL until 28 May 2020.

**Background of dividend arbitrage and the Purported Trading**

4.3    Withholding Tax is deducted at source from dividend payments made to shareholders. Beneficial owners of the shares based in another country can obtain a reduction or rebate of Withholding Tax if the country in which the dividend is paid has a Double Taxation Treaty with the country in which the beneficial owner is located.

4.4    Dividend arbitrage trading involves transferring the beneficial ownership of shares temporarily overseas around dividend dates, in order to minimise Withholding Tax or generate Withholding Tax reclaims.

4.5    As the strategy is one of temporary transfer only, it is executed using 'stock lending' transactions. These transactions take place under a Global Master Securities Lending Agreement ("GMSLA"). While such transactions are structured economically as loans, the entitlement to a tax rebate depends on actual transfer of title to the borrowing party. The legal structure of the loan is therefore a sale of the shares, on condition that the seller is obliged to sell back equivalent shares to the buyer at a specified future date.

4.6    Dividend arbitrage may give rise to significant market risk for either party, as the shares may rise or fall in value during the life cycle of the loan. To mitigate this, such strategies will often include a series of derivative transactions aimed at hedging this market exposure.

4.7     One duty of the share custodian is to issue a DCAS. This attests to the client's share ownership on the date on which the entitlement to a dividend arises, and the client's receipt of a dividend to which the shareholder is entitled. The DCAS also specifies the tax withheld at source.

4.8     Assuming the existence of a relevant Double Taxation Treaty, when the beneficial owner applies to the relevant tax authority to reclaim the Withholding Tax, it may cite the DCAS as evidence of share ownership. This application process is often carried out by a specialist agent known as a tax reclaim agent.

4.9     During the Relevant Period, in relation to Danish stocks, it was possible for shareholders residing in the United States – with which Denmark had a Double Taxation Treaty – to apply for a rebate of that Withholding Tax, assuming the transfer of Danish shares to a US shareholder took place by the relevant deadline. The Danish Tax Authority required a DCAS to be provided in support of applications to reclaim Withholding Tax as evidence of share ownership.

**The Purported Trading**

4.10    The Purported Trading took place in two phases:

   a)    A sequence of cash equity trades which purported to transfer ownership of very large quantities of Danish equities to US-domiciled Pension Plans (mirrored by equal and opposite stock lending trades) at a point in time when a dividend in the relevant Danish equity had been declared but not paid. This was the cum-dividend phase of the trading. The Purported Trading also purported to include derivative trades (in the form of forwards) to hedge against movements in the price of the equity; and

   b)    Once the Danish equities were ex-dividend (i.e. no longer carried with them the benefit of that particular dividend payment), a sequence of trades which purported to reverse the first sequence and transfer those Danish equities back to their previous owners, in such a way that parties on both sides returned to the positions they occupied immediately prior to the first phase. This was the unwind phase of the trading.

4.11    Between 14 March and 7 August 2014, ISL purported to clear and settle cum-dividend equity trades in Danish equities to the value of £15.7 billion. On average, the trades which ISL purported to settle, on behalf of ISL Clients in companies listed on the Danish Stock Exchange, equated to 26 times the total number of shares traded on European exchanges in relation to each of the relevant Danish stock on the trade dates. These huge trades, requiring huge sums to fund them,

and vast quantities of shares to fulfil them, were all purportedly settled within ISL's own small pool of Clients.

4.12    For example, on a single day, 20 March 2014, ISL approved purported OTC cum-dividend equity trades to the value of £8.3 billion. Those Purported Trades included the purported sale by just one of the Offshore Entities of £1.7 billion worth of shares of just one Danish stock.

4.13    Mr Teraiya was familiar with the concept of dividend arbitrage. He had participated in related strategies as an executing broker and as a stock lending intermediary. However, he had no prior experience of providing custody services. Mr Teraiya recruited a few individuals prior to the commencement of the Trading Strategy, but throughout the Relevant Period, ISL never had – in addition to Mr Teraiya himself – more than two staff working on the Purported Trading at any one time.

4.14    Mr Teraiya was the controlling mind of ISL throughout the Relevant Period, and after the Purported Trading began he participated in monthly board meetings, from April 2014 to January 2015, at which a financial survey of the custody business, including the status of client money and assets within the ISL omnibus account and its sub-custody accounts, was a standard agenda item. He had joint oversight of the maintenance of ISL's internal client account records of the Purported Trading, which included ensuring approval criteria were met and positions were correctly updated. He had personal conduct of trade clearing, and personally confirmed trade approvals, particularly during the initial cum-dividend phase of the Purported Trading.

4.15    ISL had its own custody account with a prime broker but, despite the huge volume of the Purported Trades, at no point during the Relevant Period did that prime broker hold on ISL's behalf any shares in the companies purportedly traded by the US Pension Plans. Mr Teraiya was aware that the Purported Trades were being promptly matched and completed within ISL's own small pool of Clients. He has told the Authority he believed it was therefore not necessary to update ISL's own prime broker, but the Authority does not accept his account.

4.16    ISL was specifically asked by the Authority, during its investigation, to identify any other institution, such as a sub-custodian, or custodian bank, which had provided support to ISL in meeting its duties as clearer and custodian in respect of the Purported Trading. ISL confirmed that it had no active account in respect of any of the Purported Trading with any such institution during the Relevant Period.

11

4.17    In one instance, a single trade purportedly cleared and settled by ISL consisted of a sale of 12.5m shares of a Danish stock at a total price of over DKK 3 billion, the equivalent of approximately £346m. Mr Teraiya knew that ISL's Clients had neither money nor shares to complete such transactions. Instead, he purported to clear and approve only equal and opposite Purported Trades, which neutralised one another, so that no money or shares moved in either direction.

4.18    In general, settlement between two different custodians is required and those custodians must coordinate with the relevant clearing and settlement institutions the simultaneous and reciprocal transfer of securities and cash, in accordance with the terms of the trade and the industry standard of delivery versus payment. Accordingly, a custodian can execute a securities settlement only if that client has made available the resources needed. The seller needs to provide its custodian with a sufficient quantity of stock to be delivered, while the buyer needs to provide a sufficient amount of cash to be paid in exchange. Once that is in place, the delivery versus payment process will usually ensure successful settlement.

4.19    However, if both seller and buyer happen to hold assets on deposit at the same custodian (if for example the custodian is a large bank with a large and diverse customer base) settlement may be effected via "book-entry" or "internalised" settlement. A mutually neutralising pair of trades may therefore, in some circumstances, be settled in this way.

4.20    By contrast, in the Purported Trading, the supposed internalised settlements were pre-engineered, and occurred between one small group of Clients, at one small custodian, which purported to act as both custodian and clearing broker, but without access to any of the underlying cash or equities. Internalised settlements were not the exception, but were universal across the Purported Trading. This systematic and premeditated practice of setting trades off against one another, in the absence of any real shares or money, constituted an abuse of the normal (albeit exceptional) industry practice of internalised, or book-entry, settlements.

4.21    The Authority considers that the Purported Trading was fictitious, and that Mr Teraiya knew this. He knew no money or shares were changing hands. He knew that no dividends were received by ISL Clients as a result. He has admitted that ISL never held funds in its bank account representing the dividends and that should a Client wish to withdraw its shares or money, without completing the full cycle of trading envisaged by the Trading Strategy, it would be unable to do so.

4.22    Accordingly, the Authority considers that the underlying 'contracts' between ISL

Clients for cash equity sales and stock lending were sham contracts never intended to have legal effect and the ISL Clients who entered into them were not expected to fulfil them; nor were they capable of fulfilling them. The Authority further considers that the sole utility of the Purported Trading was to create documentation capable of supporting claims for Withholding Tax, and that Mr Teraiya knew all of this.

**Formulation of the trading strategy**

4.23    In 2013, Mr Teraiya discussed the Trading Strategy with two individuals based in Dubai ("the Dubai Individuals"), one of whom had a close family connection to Mr Teraiya. The Dubai Individuals introduced Mr Teraiya to an individual based in the USA ("the USA Individual").

4.24    According to Mr Teraiya, the Trading Strategy was explained to him by the USA Individual during a telephone call at the end of 2013 and then a subsequent face-to-face meeting in January 2014, but he was not provided with any written business plan or presentation. Mr Teraiya has admitted that as a result of these discussions he understood the following about the Trading Strategy:

   a)    ISL's role was to be the clearer and share custodian in the Trading Strategy;

   b)    The Trading Strategy would be one of dividend arbitrage, which would include the reclaiming of Withholding Tax;

   c)    The Clients would be "*small to medium size*" US Pension Plans;

   d)    The business would be "*very high-volume*", because the margins on individual trades in dividend arbitrage are very slight;

   e)    A single US Pension might trade €500m euros worth of shares, possibly in a single trade; and

   f)    To enable the US Pension Plans to 'settle' the cash equity trades, the USA Individual would ensure that the parties would also enter a matching stock lending trade, equal and opposite to the cash equity trade, such that the two would net to zero.

4.25    Mr Teraiya decided that ISL would participate in the Trading Strategy, and told the Authority that he was "*quite comfortable with what was being proposed*". The Authority considers that, given his knowledge of the points set out immediately above (together with the lack of real scrutiny with which he went on to conduct

13

the onboarding process as set out further below), Mr Teraiya understood at the outset that the Trading Strategy would not involve genuine trades, and that its purpose was so that ISL could arrange for DCASs to be created which purported to show that the US Pension Plans held the relevant shares on the record date for dividend so that WHT reclaims could be made.

**Variation of ISL's Part 4A permission**

4.26    On 11 December 2013, Mr Teraiya applied to the Authority on behalf of ISL for a variation of its Part 4A permission to allow it to provide clearing and custody services. The Regulatory Business Plan which Mr Teraiya included with the application indicated that ISL intended "*to undertake the safeguarding and administration of client assets and to arrange the safeguarding and administration of client assets and to be able to hold and control client money*".

4.27    The Regulatory Business Plan also set out that:

a)    ISL planned "*to broaden its service offering to include providing custody, clearing and ancillary services to institutional clients*";

b)    ISL had identified, through discussions with "*clients, prospects and market counterparts*", that there appeared to be "*demand for a 'mini' custody and clearing services provider driven primarily by the lack of appetite from larger global institutions to deal with small to mid-size asset gatherers that do not have significant assets under management or very high transaction volumes*";

c)    ISL planned to increase the business "*slowly and sustainably*" and that its "*conservative financial projections*" were "*based on on-boarding 10 clients in year 1 adding 5 new clients every year*";

d)    "C*lient positions [would] be restricted where necessary and margining [would] be used to limit the exposure of Indigo as custodian*"; and

e)    "*Additional operational risk would be partially addressed by using established custodians and clearing houses*". ISL would use "*appropriately capitalised custodians and clearing houses*" to address "*counterparty credit risk*".

4.28    These statements by Mr Teraiya are fundamentally inconsistent with the key elements of the Trading Strategy as set out in paragraph 4.24 above, which, on

14

Mr Teraiya's own account, he already understood following conversations in December 2013 and, at the latest, January 2014. As Mr Teraiya allowed ISL to participate in the Trading Strategy between December 2013 and, at the latest, February 2014, he must have known that the application was materially inaccurate before the application to vary ISL's Part 4A permission took effect on 7 March 2014, if not when he made the application in December 2013. However, he took no steps to inform the Authority of this or provide details of ISL's intention to participate in the Trading Strategy. By failing to do so, Mr Teraiya deliberately misled the Authority.

4.29    The expense incurred by ISL in taking the necessary steps to vary the permissions was met at least in part by the Dubai Individuals, and the Authority considers that this was in return for ISL's participation in the Purported Trading. It was specified by the Authority that the variation was conditional on an increase in ISL's share capital from £100,000 to £500,000. A transfer of €399,989.94 was made to ISL on 26 March 2014 from an account linked to one of the Dubai Individuals. This partially funded the subsequent purchase of 400,000 shares at £1.00 each for Mr Teraiya as sole shareholder of ISL.

**The Trading Strategy is implemented**

4.30    The Purported Trading commenced on 14 March 2014. ISL was the share custodian to all parties involved in the Purported Trading. It purported to consist of high-volume transactions between US Pension Plans, the Forward Intermediary, the Stock Lending Intermediary and the Offshore Entities. The transactions were in three instruments: cash equities, stock loans and forwards.

4.31    Execution services in relation to the cash equity trades were purportedly carried out by the Cash Equity Broker, but the trades were 'given up' for clearing and settlement by ISL. Stock lending was purportedly carried out by the Stock Lending Intermediary. The forward trades, which purported to insure the Clients against market risk, were carried out by the Forward Intermediary.

**The Clients**

*The Intermediaries*

4.32    The Forward Intermediary was a management consultancy, incorporated in the United Arab Emirates on 13 February 2013. Its custody agreement with ISL was signed on 3 March 2014. Mr Teraiya signed the Client Acceptance and Risk Rating form approving the onboarding of the Forward Intermediary on 5 March 2014.

4.33    The Stock Lending Intermediary was incorporated on 11 February 2014 in the Cayman Islands. According to Mr Teraiya, it was recruited to participate in the Trading Strategy by either the Dubai Individuals or the USA Individual. It entered into a custody agreement with ISL on or shortly after 6 March 2014.

4.34    Mr Teraiya accepted in interview that he had no specific knowledge regarding the access of the Stock Lending Intermediary (or the Cash Equity Broker) to large quantities of Danish equities. The Authority considers that he had no interest in enquiring into such access, because he understood the intermediaries would not need to find, nor could have found, sufficient shares to complete them.

*The US Pension Plans*

4.35    Between 28 February 2014 and 15 March 2014, 26 US Pension Plans were onboarded at ISL. All were created between 27 January 2014 and 13 March 2014, and so had existed for a matter of days or weeks at the time of onboarding. All were 401(k) Pension Plans, and thus had their annual contributions fixed by US statute at a maximum of USD23,000 per year. All had a single natural person as beneficiary. As these entities were very small, it was manifestly unlikely that they could have obtained financing to enter into huge Purported Trades.

4.36    All of the US Pension Plans were introduced to ISL by the USA Individual and all were represented by one of two Investment Managers. ISL entered into custody agreements with the US Pension Plans, signed by Mr Teraiya.

4.37    Mr Teraiya supervised the onboarding at ISL of the US Pension Plans. When overseeing the onboarding of these Clients and signing off their Client Acceptance and Risk Rating Forms, Mr Teraiya did not ask how large each individual Client's trading would be. Nor did he ask about each Client's capacity to fund the trading.

4.38    When asked by the Authority, Mr Teraiya stated that their funding might come from "*external sources*" but did not identify any plausible basis upon which small US pension plans could finance the levels of trading envisaged by the Trading Strategy.  ISL recorded no payments at all into its accounts from or on behalf of any of the US Pension Plans in advance of the Cum-Dividend Trading, and afterwards received a total of only two payments totalling €199,149.46 across all of them (other than what was received into those accounts in respect of tax reclaims) despite purportedly clearing and settling, on behalf of those Clients, cum-dividend trades worth approximately £15.7bn. Mr Teraiya accepted that, if the trading was genuine, ISL could have been rendered insolvent by default by

16

one Client on only one trade. He told the Authority that this was "*a risk [he] was willing to take at the time*".

4.39    The Authority considers that Mr Teraiya understood at the time that there was no such risk, because he understood that the contracts ISL and its Clients had entered into were sham contracts which did not, and were never intended to, create the legal relations which they appeared to create. They were never intended to result in any genuine transfer of shares or money between ISL Clients, or in any shares being held in ISL's custody on behalf of those Clients. As such, they created no genuine rights or liabilities which might be enforced against ISL.

4.40    The Authority also considers that Mr Teraiya entered into such sham contracts on behalf of ISL in the belief that their existence would help to disguise (including from any auditors or regulatory authorities which happened to scrutinise them) the fact that the trading was fictitious.

*The Offshore Entities*

4.41    Between 28 February 2014 and 15 March 2014, five Offshore Entities were onboarded. Mr Teraiya signed the forms accepting them as Clients and assessing (or purporting to assess) their risk factors. At least some of the Offshore Entities were recruited to the Trading Strategy through contacts of Mr Teraiya.

**The scale of the Purported Trading in Stock A**

4.42    Company A is an OMX Copenhagen Company, one of the top 20 listed companies on the Danish Stock Exchange. The trades in Stock A which ISL purported to settle on 20 March 2014 were for 300,523,350 shares which represented 13.6% of the shares outstanding in the company and 66 times the total number of all shares traded in that stock on European exchanges on that day.

Volume of shares



4.43    Changes in shareholdings of such a magnitude can be of strategic importance to the future of a listed company. During the Relevant Period, a shareholder in Danish stocks was legally obliged to notify both the issuer and the Danish Financial Supervisory Authority if its holding of Stock A crossed a 5% threshold. Further notification was also required in the event that other thresholds were crossed, including 10% and 15%.

4.44    Mr Teraiya had described ISL's target clientele to the Authority in his Regulatory Business Plan only a few months earlier as too small for *"larger global institutions"* to be interested in them as Clients. In the first quarter of 2014, industry analysis of the stock lending utilisation rate of Danish equities by major hedge funds and other institutional investors found it was only slightly over 5% in total, including the holdings of the largest institutional investors. This is another indication of just how remote is the possibility that ISL's pool of single individual pension plan Clients might have borrowed, or otherwise held, 13.6% of any major Danish stock.

4.45    Therefore, it is not credible, and the Authority considers that Mr Teraiya did not believe, that ISL's Clients were capable of collectively settling purchases of 13.6% of Stock A on a single day, 20 March 2014, nor that they were capable of the Purported Trading on 19 August 2014, when ISL purported to approve and settle OTC ex-dividend equity trades on behalf of its Clients for the same quantity of shares in Stock A to the value of £8.1 billion (for trades completed 19 August 2014).

**An example of the Purported Trading in Stock A**

4.46    The following trading example, commencing on 20 March 2014, is indicative of the pattern of the Purported Trading. A graphic representation of this pattern is found

at Annex B. On 20 March 2014, the Cum-Dividend Trading commenced:

a)   An Investment Manager emailed ISL at 2:53pm on behalf of a US Pension Plan ("Client A") (which had been onboarded as an ISL Client just under a week earlier, on 14 March 2014) to ask ISL to approve the purchase of cum-dividend shares in Stock A. The number of shares purportedly to be purchased was 12.5m, worth approximately £346m.

b)   The Cash Equity Broker had earlier that day purported to confirm the availability of those shares to the Investment Manager.

c)   On the same date, at 2:54pm, another Investment Manager emailed ISL on behalf of one of the Offshore Entities ("Client B") to ask ISL for approval for an equal and opposite transaction – i.e., to sell 12.5m shares in Stock A.

d)   On the same date, ISL purported to 'match' these two requests, and approve the resulting trade for settlement on 26 March 2014. The purported volume of just this one trade constituted approximately 2.7 times the entire aggregate volume of shares in Stock A traded that day on European exchanges.

e)   On 26 March 2014, ISL also confirmed settlement of another set of equity trades involving Client A and Client B. These purported to be stock lending transactions, and took place via the Stock Lending Intermediary, also a Client of ISL. This time, Client B purported to 'borrow', and Client A purported to 'lend' 12.5m shares in Stock A. As 'borrowing' shares in a stock lending transaction requires the borrowing party to purchase them legally, this meant that in addition to Client A purporting to _buy_ 12.5m shares in Stock A from Client B, Client A was also purporting to _sell_ 12.5m shares to Client B, in the same stock, on the same day.

f)   In addition to the symmetrical nature of the Purported Trading, its circularity will also be noted: Client B purported, by borrowing 12.5m shares from Client A (in the second set of transactions) to provide delivery of the 12.5m shares promised to Client A (in the initial set of transactions); conversely, Client A purported, by lending 12.5m shares to Client B (in the second set of transactions) to acquire sufficient funds to pay for 12.5m shares purchased from Client B (in the initial set of transactions).

g)   ISL stipulated that each trade had to be either filled in its entirety or not at all; given the symmetry already noted, the Authority considers that this was to avoid any imbalance, as a result of which ISL might have had to account for it by recourse to a party such as a bank or prime broker outside of ISL's

19

network.

h)   Client A and Client B also engaged, in parallel to the above, in a series of purported forward transactions by which they purported to hedge exposure to supposed market risk in the event of a change in the price of the stock.

i)   ISL recorded the purported effect of the trades in a spreadsheet in which it netted off the various positions of ISL's Clients against one another.

4.47   On 26 March 2014, ISL issued a DCAS to Client A. It stated under Client A's name and account number the following: (i) the "*number of securities*" was 12.5m shares in Stock A; (ii) the "*gross dividend*" was DKK 56,250,000, (iii) the "*net dividend*" was DKK 41,062,500; and (iv) the "*tax*" was DKK 15,187,500.

4.48   DKK 15,187,500 was subsequently paid out by the Danish Tax Authority on the basis that Client A owned those shares and was entitled to a corresponding refund of Withholding Tax. Had this been true, Client A's holding of Stock A at that time would have been significantly greater than major institutional investors in Stock A, including global banks, and a major pension fund highly placed in the Fortune 500. Client A, by contrast, was a pension plan with a single beneficiary which had existed for only a few weeks. The Authority considers that Mr Teraiya, an experienced equities broker, understood at the time that Client A neither had, nor could have had, such a large holding in Stock A.

4.49   On 19 August 2014, the Unwind Trading commenced:

a)   On 19 August 2014, ISL approved for settlement on 22 August 2014 the sale of 12.5m shares in Stock A from Client A to Client B;

b)   ISL approved for settlement on 22 August 2014 the purchase (or 'recall') from Client B to Client A, via the Stock Lending Intermediary, of 12.5m shares sold (or 'loaned') during the first phase of the trading;

c)   Taken together, these purported transactions required (as with the first phase) delivery of neither cash nor shares between the parties. Client A purported to use the shares it had recalled from Client B to sell 12.5m shares to Client B; Client B purported to use the 12.5m shares it was buying from Client A to repay the shares it had previously borrowed from Client A.

d)   Client A and Client B also purported to take part in unwinding trades for the forward positions which had been taken out during the Cum-Dividend

Trading phase.

4.50    As before, ISL was notified of these trades via emails from Investment Managers purporting to act on behalf of Clients A and B.

4.51    In addition, ISL cleared and settled purported cum-dividend trades on behalf of Client A in eight other Danish stocks during the Relevant Period with an aggregate value of over £276m. ISL received no funds from or on behalf of Client A before any of those trades were completed.

4.52    Furthermore, ISL issued a client statement to Client A suggesting that it had received dividends on 26 March 2014 in relation to Stock A, although there is no evidence that ISL received any dividends on behalf of Client A.

**Production of DCASs**

4.53    During the Relevant Period, to apply to the Danish Tax Authority for a refund of Withholding Tax, a shareholder (or a person with power of attorney to act on the shareholder's behalf) needed to provide certain key pieces of information to the Danish Tax Authority. As well as specifying on the application form itself the sum in Danish Kroner of the refund being claimed, the Danish Tax Authority stated on the relevant form that it was "*obligatory*" to enclose, with every application claiming a refund of Withholding Tax, a "*dividend advice*", or DCAS.

4.54    ISL's DCASs were set out in a standard form. The words "CREDIT ADVICE – DIVIDEND" and the date of issue of the note were set out near the top of the document in tramlines. Underneath was the name, address and account identifier of the Client concerned. The company and class of shares purportedly held were identified, plus the ex-date and payment date of the dividend in respect of such shares. The DCASs purported to set out the number of shares held by the ISL Client concerned, the gross and net dividend received, and the tax paid. Specialised tax reclaim agents, rather than ISL, sent the DCASs to the tax agency in Denmark.

4.55    Each DCAS was individually endorsed with ISL's company stamp, had the "Indigo Securities" logo at the top, and included the firm's registered address and contact details at the bottom. The Authority considers that ISL and Mr Teraiya understood the DCASs would be used as certificates showing that ISL Clients owned the relevant shares, had received the dividends, and had paid the Withholding Tax.

4.56    When challenged in interview over ISL's production of DCASs, Mr Teraiya

responded that he produced them "*as per my obligation as a custodian*" on the basis that DCASs represented the "*dividend entitlement of a client on a relevant date*". He said he was "*comfortable in producing that dividend credit advice because that particular client, or that long client on a relevant day is entitled to that dividend and my obligation is to pay them that dividend*". The Authority considers that ISL's DCASs did much more than make representations as to the "dividend entitlement", and were materially inaccurate in three ways.

*Ownership of shares*

4.57    First, the DCASs issued by ISL purported to certify that the US Pension Plans owned the specific number of shares there set out. ISL's custody contracts, which were signed by Mr Teraiya, confirm that it was obliged to "*arrange for investments to be held by the Custodian or by sub-custodians appointed by the Custodian*" and Mr Teraiya acknowledged in interview that it was ISL's role as custodian to keep shares safe on behalf of the Clients. However, ISL issued DCASs having never instructed the Prime Broker that any of its US Pension Plan Clients had purchased any shares, including in Stock A. As ISL had no other active account with any sub-custodian or custodian bank, it had no basis to do this.

4.58    When asked how he satisfied himself that his Clients owned shares, Mr Teraiya purported to believe that the Cash Equity Broker would "*have that confirmation that that client has actually bought those shares, or the client has sold their shares*". However, he could not explain, when asked, by what mechanism the Cash Equity Broker might have registered share ownership. He also could not explain where he would have gone to retrieve the shares, in the event ISL had received a client instruction to transfer them to another custodian.

4.59    The Authority considers that Mr Teraiya, with his years of experience in the equities market, could not have believed that these responsibilities could be delegated to the Cash Equity Broker. He must have known that it was ISL's records upon which not only Clients, but also third parties, expected, or would have been expected, to rely regarding the Clients' share holdings. Otherwise, it would never have been part of ISL's "obligation as a custodian" in the first place to provide DCASs to Clients or tax reclaim agencies.

4.60    Accordingly, the Authority considers that Mr Teraiya knew there was no proper basis for ISL to assert that its Clients owned the relevant shares.

*Receipt of dividend*

22

4.61    Second, the DCASs set out that the Client had received a specified sum as share dividend. ISL's custody agreements stated that it would "*attend to the collection of all income due on, and the vesting of all other rights and entitlements attaching to, Investments*". This is a different (and more onerous) obligation than Mr Teraiya's suggestion that ISL was merely obliged to record the dividend entitlement. It is also in line with standard industry practice under which it is the role of the custodian to receive dividends payable on the assets it holds.

4.62    Neither did ISL pay the dividend to its Clients, as Mr Teraiya has suggested it was obliged to do. ISL purported to 'pay' the Client by recording a credit for the relevant sum, which had not been externally received, in the relevant Client's account. The custody contracts set out an obligation to credit the Client account, but this is contingent on the dividend being received: "*Dividends… will be credited to the Client on the date when the Custodian receives notification of receipt by the sub-custodian or after receipt of funds…*". Mr Teraiya knew that ISL had not received such notification, from any sub-custodian, of its Clients' receipt of such share dividends. The Authority considers that Mr Teraiya knew no share dividend at all had been received.

*Payment of tax*

4.63    Third, the DCASs set out that a certain sum had been withheld from the dividend concerned as Withholding Tax. Given that (as set out above) Mr Teraiya knew ISL held no relevant shares, had never instructed ISL's prime broker of any purported share purchases, and had received no share dividends on its Clients' behalf, the Authority considers that Mr Teraiya knew that no such tax had been withheld from ISL's Clients.

4.64    Despite this, at Mr Teraiya's instruction, ISL sent the DCASs to the Investment Managers. Mr Teraiya knew that those DCASs were to be used in support of applications for Withholding Tax reclaims. On occasion, ISL provided them directly to tax reclaim agents. Mr Teraiya was also aware that the DCASs issued by ISL in respect of the Purported Trading resulted in the payment of millions of euros into ISL's cash account from tax reclaim agencies, because he knew those funds were transferred to ISL Client accounts, as set out below.

**Proceeds of the tax reclaims**

4.65    During the Relevant Period, €91.247m of Tax Reclaim Funds was transferred to

ISL on the basis of the Purported Trading. Only €2.079m of that money was transferred by ISL to the Clients who, purportedly, had suffered the tax. ISL retained €1.241m in transaction and other fees. Fees were also paid out on behalf of the US Pension Plans to the Cash Equity Broker and the intermediaries.

4.66    The remainder – over 90% – was transferred to third parties which either had no obvious connection to the Purported Trading, or had a role in the strategy but no direct entitlement to any purported reclaim resulting from it.  In particular, huge payments in excess of €44m were made to an entity partially owned by the Dubai Individuals ("the First Receiving Entity").

4.67    Payments to the First Receiving Entity followed a series of emails to ISL from one of the Investment Managers between 12 August and 22 September 2014, attaching supposed 'invoices' submitted on the First Receiving Entity's behalf.

4.68    Those emails were sent directly to Mr Teraiya. Just one email, sent on 19 August 2014, attached 13 invoices. Each sought a payment from the ISL Client account of a different US Pension Plan, on the following basis: a "*Success Fee payable pursuant to clause 5.1 of the Consulting Agreement dated 20 May 2014*". The sums sought ranged from €1.286m to €1.793m. Despite the huge size of the invoices, Mr Teraiya forwarded the email internally without querying it. The next day, 20 August 2014, ISL made a single payment of €19,804,374 in payment of all 13 invoices to the First Receiving Entity.

4.69    The Authority asked Mr Teraiya why such large sums, which had been reclaimed from a tax authority on behalf of ISL's Clients, were being relayed to the First Receiving Entity. He said "…*it's something that I'm not privy to, but they have consultancy or whatever agreements in with either the representatives or the pension plans itself. But that's something I'm not aware of*".

4.70    Mr Teraiya would have been aware that any such agreement entered into on 20 May 2014, as set out in the invoices, post-dated 95% of the Cum-Dividend Trading. The Authority considers that he must have known that the reference to "*Consulting Agreement[s]*" in the invoices could not explain any entitlement of the First Receiving Entity to receive the proceeds of tax reclaims, as the commencement of the contract would post-date the "*success*" of the enterprise.

4.71    For the great majority of the US Pension Plans, the "*success fee*" amounted to exactly 48% of the total sum purportedly reclaimed by that Client in Withholding Tax. The Authority considers that, contrary to his account, Mr Teraiya knew the payments represented a fixed percentage of the tax purportedly reclaimed.

4.72    Between 13 August 2014 and 29 September 2014, more than €44m of Tax Reclaim Funds was relayed to the First Receiving Entity by ISL. Following those payments:

    a)  on 27 October 2014, one of the Dubai Individuals paid the equivalent of £2,980,966 for a property in Dubai. On the same day, that property was transferred into the name of Mr Teraiya;

    b)  from February 2015 to June 2015, the same individual transferred more than USD2.5m into bank accounts controlled personally by Mr Teraiya; and

    c)  from April 2015 to May 2015, more than USD3.5m was deposited by the First Receiving Entity into bank accounts controlled personally by Mr Teraiya.

4.73    The Authority concludes that these payments to Mr Teraiya were made in return for his role in ISL's participation in the Purported Trading, and his role in relaying Tax Reclaim Funds to the First Receiving Entity.

4.74    Mr Teraiya has claimed that the payments, including the purchase of the Dubai property, were loans. For example, on 23 June 2015 one of the Dubai Individuals transferred USD2.25m to a savings account in Mr Teraiya's name. According to Mr Teraiya, this was a loan, made on the basis of a brief conversation with that individual, without interest, or any fixed term of repayment, to enable Mr Teraiya to take part in certain "*investment opportunities*". However, Mr Teraiya could not recollect the nature of those opportunities, or explain why he could not have pursued them using USD2.1m which he had sitting in a separate savings account. Furthermore, Mr Teraiya admitted that, in the succeeding four years, he had done nothing to pay the money back to the Dubai Individual as he and the Dubai Individual had "*been too busy*". The Dubai Individual confirmed, in two affidavits produced for the SKAT Litigation, that he had not received any payments from Mr Teraiya nor had he pursued him.

4.75    The Authority considers that Mr Teraiya has attempted to mislead the Authority by characterising this and other payments as loans unconnected to the Trading Strategy. It considers he has done so in an attempt to avoid the disgorgement of the payments as the benefit of his misconduct, and to attempt to conceal from the Authority that he undertook the Purported Trading in the expectation of significant personal gain.

4.76    Furthermore, Mr Teraiya knew that huge additional sums were being transferred

by ISL to other entities with no obvious connection to the Purported Trading. One entity in particular ("the Second Receiving Entity") received over €31m of Tax Reclaim Funds. This matter was dealt with by Mr Teraiya personally, without 'know your customer' checks being completed on the Second Receiving Entity, and on the basis of requests which were made without proper invoices or reasons given for the sums transferred.

4.77    The first of these requests was on 5 August 2014. One of the Investment Managers emailed Mr Teraiya, saying simply: "*Can you please wire 1.6mm EUR from [one of the Pension Plan accounts] to [a clearing bank]. Instructions below.*" The instructions, which appear to have been pasted into the body of the email in two different fonts, consisted of the bank account details of the Second Receiving Entity, and the clearing bank account details. The email concludes: "*Let me know if you need any further information*". In the next email in the chain, dated 7 August 2014, Mr. Teraiya emailed the Investment Manager to say "*Morning… This payment has been sent today. Thanks*".

4.78    This pattern continued during August 2014, with Mr Teraiya as the primary point of contact. In another example, payments totalling €2.26m were made to the Second Receiving Entity based on a single email dated 26 August 2014 from one of the Investment Managers. This time, instead of the payment information being included in the body of the email, three unformatted documents were attached. These specified three client account references, into which bank account details appear to have been cut and pasted, but which contained no header or footer, nor any specification of services or goods provided. Mr Teraiya forwarded these internally, without comment, and the requested sums were paid in full on the following day.

4.79    Further payments were made on a similar basis in October 2014. At 12.09pm on 1 October 2014, the Investment Manager sent Mr Teraiya a single email seeking payments totalling €1,442,876 from 15 different client accounts simultaneously. One minute later, Mr Teraiya forwarded this email internally, stating "FYI. If ok i will get these payments out." The requested sums were paid in full on 7 October 2014.

4.80    In January 2015, there was a further flurry of payment requests, including a single email dated 27 January 2015 seeking payments totalling €827,074.87 from 19 different client accounts simultaneously. Mr Teraiya forwarded this email internally with the single word "*FYI*". The last of these sums were paid on 29 January 2015.

4.81    For approximately half of the 27 US Pension Plans, the total payments made by ISL to the Second Receiving Entity amounted to the same percentage – 40% - of the total sum purportedly reclaimed by that Client in Withholding Tax – although here, unlike in the case of the First Receiving Entity, there was no attempt to invoke an underlying "*consultancy agreement*" or describe the payments as a "*success fee*". Payments were made to the Second Receiving Entity up to and including 27 January 2015 and further payments to third parties out of Tax Reclaim Funds were made on 29 January 2015.

## 5.    FAILINGS

5.1    The statutory and regulatory provisions relevant to this Notice are referred to in Annex A.

5.2    Statement of Principle 1 required Mr Teraiya to act with integrity in carrying out his controlled functions.

5.3    During the Relevant Period, Mr Teraiya breached this requirement in that, while acting as CF1 (Director) and CF3 (Chief executive) of ISL:

   a)   He allowed ISL to participate in the Trading Strategy by purporting to provide clearing and custody services in respect of the Purported Trading, knowing that it would not involve any genuine trades.

   b)   He deliberately misled the Authority by failing to correct statements that he made when he applied to the Authority, on behalf of ISL for a variation of ISL's Part 4A permission to allow it to provide clearing and custody services, which he knew were misleading. The Authority considers that he did so deliberately to mislead it, and pave the way for the Purported Trading to take place.

   c)   He supervised the onboarding at ISL of the US Pension Plans to participate in the Trading Strategy, knowing that they were too small to participate in huge equity trades. He signed contracts on behalf of ISL with the US Pension Plans, knowing that those contracts were sham contracts never intended to create genuine rights or obligations.

   d)   He allowed ISL to purport to clear and approve equity trades between ISL Clients for huge sums, knowing that the trades were not real, that if they had been, the relevant client accounts had insufficient cash and equities to complete them, and that the underlying purpose was to generate documentation to assist in tax reclaims. In the initial phase of the trading,

27

he had personal conduct of that clearing and approval.

e)   He instructed the provision of DCASs to the Investment Managers, purporting to record that ISL Clients owned shares, had received dividends, and that these had been subject to a deduction in respect of Withholding Tax. He knew that this information was false and that the Investment Managers intended to use it to reclaim non-existent tax.

f)   He understood that the Tax Reclaim Funds were to be distributed among those who introduced or had conduct of the Trading Strategy, and so accepted contrived or inadequately documented instructions from the Investment Managers to pay out more than 80% of the Tax Reclaim Funds to the First Receiving Entity and the Second Receiving Entity, together with further sums to other third parties, as set out above.

5.4   Mr Teraiya's conduct as described above was dishonest and lacked integrity in breach of Statement of Principle 1.

5.5   Mr Teraiya engaged in the course of conduct described above in the expectation of significant personal gain. During and after the Relevant Period, large payments were made to him by the First Receiving Entity and one of the Dubai Individuals. The Authority has concluded that those payments were to remunerate him for his and ISL's participation in the Purported Trading. However, Mr Teraiya has sought to mislead the Authority as to the reason for and nature of those payments. This further indicates his lack of honesty and integrity.

5.6   As a result of the matters set out above, it appears to the Authority that Mr Teraiya is not a fit and proper person to carry out any function in relation to any regulated activity carried on by an authorised person, exempt person or exempt professional firm.

## 6.    SANCTION

**Prohibition Order**

6.1   Having regard to the guidance in Chapter 9 of EG, the Authority considers it is appropriate and proportionate in all the circumstances to prohibit Mr Teraiya from carrying out any function in relation to any regulated activity carried on by an authorised person, exempt person or exempt professional firm. This is because Mr Teraiya lacks honesty and integrity and is not a fit and proper person to carry out such functions.

**Financial penalty**

6.2    The Authority also considers it appropriate to impose a penalty on Mr Teraiya under section 66 of the Act in respect of his breach of Statement of Principle 1.

6.3    The Authority's policy for imposing a financial penalty is set out in Chapter 6 of DEPP. The Authority applies a five-step framework to determine the appropriate level of financial penalty. DEPP 6.5B sets out the details of the five-step penalty framework that applies in respect of financial penalties imposed upon individuals in non-market abuse cases.

**Step 1: disgorgement**

6.4    Pursuant to DEPP 6.5B.1, the Authority seeks to deprive an individual of the financial benefit derived directly from the breach where it is practicable to quantify this.

6.5    Mr Teraiya was the sole shareholder of ISL during the Relevant Period and ISL's income from the Purported Trading constituted virtually ISL's only business from March 2014 to date. The Authority therefore considers the sum of ISL's net profits and Mr Teraiya's salary for the Relevant Period, amounting to £326,577, to constitute part of his direct financial benefit.

6.6    Additionally, Mr Teraiya received payments and other benefits from one of the Dubai Individuals and the First Receiving Entity, totalling £7,315,491, to remunerate him for his role in the Purported Trading. Mr Teraiya subsequently repaid sums totalling £2,190,314 to the First Receiving Entity. The net benefit to Mr Teraiya was therefore £5,125,177. This also constitutes direct financial benefit to Mr Teraiya.

6.7    The total at Step 1 is therefore £5,451,754.

**Step 2: the seriousness of the breach**

6.8    Pursuant to DEPP 6.5B.2G, at Step 2 the Authority determines a figure that reflects the seriousness of the breach. That figure is based on a percentage of the individual's relevant income. The individual's relevant income is the gross amount of all benefits received by the individual from the employment in connection with which the breach occurred, and for the period of the breach.

6.9    The period of Mr Teraiya's breach was from 3 March 2014 to 29 January 2015. The Authority considers Mr Teraiya's relevant income, composed of his director's remuneration and withdrawals in the 12 months preceding the end of the breach, to be £157,491.

6.10   In deciding on the percentage of the relevant income that forms the basis of the Step 2 figure, the Authority considers the seriousness of the breach and chooses a percentage between 0% and 40%. This range is divided into five fixed levels which represent, on a sliding scale, the seriousness of the breach; the more serious the breach, the higher the level. For penalties imposed on individuals in non-market abuse cases there are the following five levels:

Level 1 – 0%

Level 2 – 10%

Level 3 – 20%

Level 4 – 30%

Level 5 – 40%

6.11   In assessing the seriousness level, the Authority takes into account various factors which reflect the impact and nature of the breach, and whether it was committed deliberately or recklessly.

Impact of the breach

6.12   The Authority may take any factor relating to impact into account under DEPP 6.5B.2G(7)(a). In this case, applications to reclaim tax from the Danish exchequer were made, based on misleading documents produced by ISL, resulting in a severe impact upon and loss to the Danish exchequer of €91.247m.

6.13   The artificial nature of the trading, which purported to be conducted OTC rather than on any exchange, means that there is a lack of evidence that the market was disrupted directly. However, the Authority considers that the fact of the breach undermines confidence in the equities and securities lending markets at a more fundamental level. It shows markets being used for the unlawful impoverishment of public finances, rather than for the legitimate exchange of interests and rights in public companies (DEPP 6.5B.2G(8)(f)).

Nature of the breach

6.14    Mr Teraiya breached Statement of Principle 1 over an extended period of time (DEPP 6.5B.2G(9)(b)).

6.15    The breach facilitated potential financial crime in the form of applications, based on misleading documents produced by ISL, by the US Pension Plans to reclaim Withholding Tax from the Danish exchequer (DEPP 6.5B.2G(9)(d)).

6.16    Mr Teraiya failed to act with integrity because he acted dishonestly (DEPP 6.5B.2G (9)(e)).

6.17    Mr Teraiya was an experienced industry professional with more than ten years trading in equities, including stock lending and execution broking (DEPP 6.5B.2G((9)(j)).

6.18    Mr Teraiya, as the individual approved to perform the CF1 (Director) and CF3 (Chief executive) and, until 1 September 2014, the CF10 (Compliance Oversight) functions, held a senior position at ISL (DEPP 6.5B.2G(9)(k)).

Deliberate misconduct

6.19    Mr Teraiya knew that the Purported Trading was fictitious. His conduct in relation to the Purported Trading was intentional (DEPP 6.5B.2G(10)(a)).

6.20    Mr Teraiya intended to, and did, profit from the breach personally to a very significant extent (DEPP 6.5B.2G (10)(b)). He engaged in the conduct described above in the expectation of significant personal gain. During and after the Relevant Period, large payments were made to him by the First Receiving Entity and one of the Dubai Individuals. The Authority has concluded that those payments were to remunerate him for his and ISL's participation in the Purported Trading.

6.21    Mr Teraiya committed the breach in the belief that the fictitious nature of the trading would not be easily discovered (DEPP 6.5B.2G (10)(e)).

Level of seriousness

6.22    DEPP 6.5B.2G (12) sets out the factors likely to be considered level 4 or 5 factors. Of these, the Authority considers the following factors to be relevant:

    a)    The breach created a significant risk that financial crime would be facilitated, occasioned or otherwise occur;

b)  Mr Teraiya failed to act with integrity; and

c)  The breach was committed deliberately.

6.23    The Authority does not consider that any of the factors set out under DEPP 6.5B.2G (13), likely to be considered level 1, 2 or 3 factors, apply.

6.24    Taking the above factors into account, the Authority considers the level of seriousness of the breach to be 5. The Step 2 figure is therefore 40% of £157,491.

6.25    Step 2 is therefore £62,996.

**Step 3 – mitigating and aggravating factors**

6.26    Pursuant to DEPP 6.5B.3G, at Step 3, the Authority may increase or decrease the amount of the financial penalty arrived at after Step 2, but not including any amount to be disgorged as set out in Step 1, to take into account factors which aggravate or mitigate the breach.

6.27    The Authority considers that the following factor aggravates the breach:

a)  Mr Teraiya took steps to disguise very large payments made to him by one of the Dubai Individuals and the First Receiving Entity to remunerate him for his role in the Purported Trading, and sought to mislead the Authority as to the nature of and reason for the payments. The Authority considers he did so in an attempt to conceal his misconduct and avoid disgorgement of these sums.

6.28    The Authority considers that there are no mitigating factors present in this case.

6.29    Having taken into account these aggravating factors, the Authority considers that the Step 2 figure should be increased by 10%, or £6,299.

6.30    Step 3 is therefore £69,295.

**Step 4: adjustment for deterrence**

6.31    Pursuant to DEPP 6.5B.4G, if the Authority considers the figure arrived at after Step 3 is insufficient to deter the individual who committed the breach, or others, from committing further or similar breaches, then the Authority may increase the penalty.

6.32    The Authority has considered the seriousness of the misconduct, including the

sums of Withholding Tax wrongly reclaimed as a result, together with Mr Teraiya's significant sources of income and benefits over and above his relevant income, both during and after the Relevant Period. The rewards potentially available to Mr Teraiya for his misconduct were very significant. Given these factors, the Authority considers that the figure arrived at after Step 3 does not represent a sufficient deterrent to Mr Teraiya and others and considers that the Step 3 figure of £69,295 should be increased to £500,000 to represent a sufficient deterrent.

6.33    Step 4 is therefore £500,000.

**Step 5: settlement discount**

6.34    Pursuant to DEPP 6.5B.5G, if the Authority and the individual on whom a penalty is to be imposed agree the amount of the financial penalty and other terms, DEPP 6.7 provides that the amount of the financial penalty which might otherwise have been payable will be reduced to reflect the stage at which the Authority and the individual reached agreement.

6.35    No settlement discount applies.

**Penalty**

6.36    The Authority has therefore decided to impose a total financial penalty (including disgorgement of £5,451,754) of £5,951,754 on Mr Teraiya for breaching Statement of Principle 1.

## 7.    REPRESENTATIONS

7.1    Annex C contains a brief summary of the key representations made by Mr Teraiya in response to the Warning Notice and how they have been dealt with. In making the decision which gave rise to the obligation to give this Notice, the Authority has taken account of all the representations made by Mr Teraiya, whether or not set out in Annex C.

## 8.    PROCEDURAL MATTERS

8.1    This Notice is given to Mr Teraiya under sections 57 and 67 of the Act and in accordance with section 388 of the Act.

8.2    The following paragraphs are important.

**Decision maker**

8.3    The decision which gave rise to the obligation to give this Notice was made by the RDC. The RDC is a committee of the Authority which takes certain decisions on behalf of the Authority. The members of the RDC are separate from the Authority staff involved in conducting investigations and recommending action against firms and individuals. Further information about the RDC can be found on the Authority's website:

https://www.fca.org.uk/about/committees/regulatory-decisions-committee-rdc.

**The Tribunal**

8.4    Mr Teraiya has the right to refer the matter to which this Notice relates to the Tribunal. Under paragraph 2(2) of Schedule 3 of the Tribunal Procedure (Upper Tribunal) Rules 2008, Mr Jones has 28 days from the date on which this Notice is given to him to refer the matter to the Tribunal. A reference to the Tribunal is made by way of a signed reference notice (Form FTC3) filed with a copy of this Notice. The Tribunal's contact details are: Upper Tribunal, Tax and Chancery Chamber, Fifth Floor, Rolls Building, Fetter Lane, London EC4A 1NL (tel: 020 7612 9730; email: fs@hmcts.gsi.gov.uk).

8.5    Further information on the Tribunal, including guidance and the relevant forms to complete, can be found on the HM Courts and Tribunal Service website:

http://www.justice.gov.uk/forms/hmcts/tax-and-chancery-upper-tribunal

8.6    A copy of Form FTC3 must also be sent to the Authority at the same time as filing a reference with the Tribunal. A copy should be sent to Giles Harry at the Financial Conduct Authority, 12 Endeavour Square, London E20 1JN.

8.7    Once any such referral is determined by the Tribunal and subject to that determination, or if the matter has not been referred to the Tribunal, the Authority will issue a Final Notice about the implementation of that decision.

**Access to evidence**

8.8    Section 394 of the Act applies to this Notice.

8.9    The person to whom this Notice is given has the right to access:

    a)    the material upon which the Authority has relied in deciding to give this

Notice; and

b)    the secondary material which, in the opinion of the Authority, might undermine that decision.

**Third party rights**

8.10    A copy of this Notice is being given to Indigo Global Partners Limited (in liquidation) as a third party identified in the reasons above and to whom in the opinion of the Authority the matter to which those reasons relate is prejudicial. That party has rights of representation and access to material similar to those set out above, in relation to the matter which identifies it.

**Confidentiality and publicity**

8.11    This Notice may contain confidential information and should not be disclosed to a third party (except for the purpose of obtaining advice on its contents). In accordance with section 391 of the Act, a person to whom this Notice is given or copied may not publish the Notice or any details concerning it unless the Authority has published the Notice or those details.

8.12    However, the Authority must publish such information about the matter to which a Decision Notice or Final Notice relates as it considers appropriate. The persons to whom this Notice is copied should therefore be aware that the facts and matters contained in this Notice may be made public.

**Authority contacts**

8.13    For more information concerning this matter generally, contact Giles Harry at the Authority (direct line: 020 7066 8072/ email: Giles.Harry@fca.org.uk).

**Elizabeth France**
**Deputy Chair, Regulatory Decisions Committee**

## ANNEX A

### RELEVANT STATUTORY AND REGULATORY PROVISIONS

**1.    RELEVANT STATUTORY PROVISIONS**

1.    The Authority's statutory objectives, set out in section 1B(3) of the Act, include the integrity objective: protecting and enhancing the integrity of the UK financial system (as defined in section 1D of the Act).

2.    Section 56 of the Act provides that the Authority may make an order prohibiting an individual from performing a specified function, any function falling within a specified description or any function, if it appears to the Authority that that individual is not a fit and proper person to perform functions in relation to a regulated activity carried on by an authorised person, exempt person or a person to whom , as a result of Part 20, the general prohibition does not apply in relation to that activity. Such an order may relate to a specified regulated activity, any regulated activity falling within a specified description, or all regulated actives.

3.    Section 66 of the Act provides that the Authority may take action against a person if it appears to the Authority that he is guilty of misconduct and the Authority is satisfied that it is appropriate in all the circumstances to take action against him. A person is guilty of misconduct if, while an approved person, he has failed to comply with a statement of principle issued under section 64A of the Act, or has been knowingly concerned in a contravention by a relevant authorised person of a relevant requirement imposed on that authorised person.

**2.    RELEVANT REGULATORY PROVISIONS**

1.    Statements of Principle and Code of Practice for Approved Persons

The Authority's Statements of Principle and Code of Practice for Approved Persons have been issued under section 64[1] of the Act.

Statement of Principle 1 states:

"*An approved person must act with integrity in carrying out his accountable*

---

[1] Section 64A of the 2000 Act from 7 March 2016.

*functions.*"[2]

The Code of Practice for Approved Persons sets out descriptions of conduct which, in the opinion of the Authority, do not comply with a Statement of Principle. It also sets out factors which, in the Authority's opinion, are to be taken into account in determining whether an approved person's conduct complies with a Statement of Principle.

2.    The Fit and Proper Test for Employees and Senior Personnel

FIT sets out the criteria that the Authority will consider when assessing the fitness and propriety of a candidate for a controlled function. FIT is also relevant in assessing the continuing fitness and propriety of an approved person.

FIT 1.3.1G states that the Authority will have regard to a number of factors when assessing the fitness and propriety of a person. The most important considerations will be the person's honesty, integrity and reputation, competence and capability and financial soundness.

3.    The Authority's policy for exercising its power to make a prohibition order

The Authority's policy in relation to prohibition orders is set out in Chapter 9 of the Enforcement Guide ("EG").

EG 9.1 states that the Authority may exercise this power where it considers that, to achieve any of its regulatory objectives, it is appropriate either to prevent an individual from performing any functions in relation to regulated activities or to restrict the functions which he may perform.

*DEPP*

4.    Chapter 6 of DEPP sets out the Authority's statement of policy with respect to the imposition and amount of financial penalties under the Act.

---

[2] During the Relevant Period, accountable functions are in summary: the Authority's controlled functions; the Prudential Regulatory Authority's controlled functions; and any other functions in relation to the carrying on a regulated activity; in relation to the authorised persons in relation to which that person is an approved person.

## ANNEX B

## EXAMPLE OF PURPORTED TRADING IN STOCK A



**Indigo example trade loop -  Client A (Long), Client B (Short), Stock A 2014**

| T-Type | T-Date | S-Date | Stock | Buyer | Seller | Qty | Price | Gross  DKK |
|--------|--------|--------|-------|-------|--------|-----|-------|-----------|
| EQUITY | 20/03/2014 | 26/03/2014 | Stock A | Client A | Cash Eq Broker | 12,500,000 | 247.4000 | 3,092,500,000 |
| EQUITY | 20/03/2014 | 26/03/2014 | Stock A | Cash Eq Broker | Client B | 12,500,000 | 247.4000 | 3,092,500,000 |
| EQUITY | 19/08/2014 | 22/08/2014 | Stock A | Client B | Cash Eq Broker | 12,500,000 | 251.2000 | 3,140,000,000 |
| EQUITY | 19/08/2014 | 22/08/2014 | Stock A | Cash Eq Broker | Client A | 12,500,000 | 251.2000 | 3,140,000,000 |

| Div per share |
|---|
| 4.5 |

| Theoretic Net Div |
|---|
|  |

| T-Type | T-Date | M-Date | Stock | Buyer | Seller | Qty | Price | Gross DKK |
|--------|--------|--------|-------|-------|--------|-----|-------|-----------|
| FORWARD | 20/03/2014 | 19/09/2014 | Stock A | Forward entity | Client A | 12,500,000 | 244.7400 | 3,059,250,000 |
| FORWARD | 20/03/2014 | 19/09/2014 | Stock A | Client B | Forward entity | 12,500,000 | 244.7400 | 3,059,250,000 |
| FORWARD | 19/08/2014 | 19/09/2014 | Stock A | Forward entity | Client B | 12,500,000 | 251.3164 | 3,141,454,500 |
| FORWARD | 19/08/2014 | 19/09/2014 | Stock A | Client A | Forward entity | 12,500,000 | 251.3164 | 3,141,454,500 |

| Theoretic WHT |
|---|
| 15,187,500 |

| T-Type | T-Date | S-Date | Stock | Qty | Borrow | Lend | Recall | Return | Price | Gross DKK |
|--------|--------|--------|-------|-----|--------|------|--------|--------|-------|-----------|
| SEC LEND | 26/03/2014 | 26/03/2014 | Stock A | 12,500,000 | Stock Lend entity | Client A |  |  | 247.4000 | 3,092,500,000 |
| SEC LEND | 26/03/2014 | 26/03/2014 | Stock A | 12,500,000 | Client B | Stock Lend entity |  |  | 247.4000 | 3,092,500,000 |
| SEC LEND | 22/08/2014 | 22/08/2014 | Stock A | 12,500,000 |  |  | Stock Lend entity | Client B | 251.2000 | 3,140,000,000 |
| SEC LEND | 22/08/2014 | 22/08/2014 | Stock A | 12,500,000 |  |  | Client A | Stock Lend entity | 251.2000 | 3,140,000,000 |

**ANNEX C**

**Nailesh Teraiya's Representations**

1. A summary of the key representations made by Mr Teraiya, and the Authority's conclusions in respect of them (in bold type), is set out below.

Substantive Representations on the Warning Notice

2. The statements in the Warning Notice amount to no more than mere, unevidenced, assertions of alleged wrongdoing. The Authority has not discharged its burden to prove the assertions made in the Warning Notice.

3. It is not asserted by the Authority that the applications to the Danish Tax Authority for a refund of Withholding Tax were fraudulent nor does the Authority allege that the Trading Strategy was unlawful, whether pursuant to the laws of England and Wales, or Denmark. Accordingly, as the Authority must be taken to accept that participation in a lawful Trading Strategy was not unlawful, the applications to the Danish Tax Authority cannot be described as "inappropriate".

4. The assertion that the trades were not "genuine" because they netted off to zero without money or shares physically trading hands is misguided and incorrect. No cogent evidence has been produced by the Authority to support the assertion, and it is not consistent with the decision in *Skatteforvaltningen v Solo Capital Partners LLP (in special administration) and others[3]* in which the Court determined that the mere fact that trades are internally netted is not, in and of itself, a valid basis to characterise the trades as sham trades. A feature, and an advantage, of the Trading Strategy, was that it enabled transactions to take place in large volumes. It is a vast leap to infer from this, that the trades were therefore not genuine.

5. Assertions have been made by the Authority as to the entitlement or otherwise of the US Pension Plans to a tax rebate. Whether or not the US Pension Plans were able to make valid claims for a tax rebate falls to be determined as a matter of Danish tax law and the Authority is not qualified to provide an opinion on this.

6. The assertion that Mr Teraiya entered into "sham" contracts[4] in the belief that their existence would help to disguise (including from any auditors or regulatory authorities which happened to scrutinise them) the fact that the trading was fictitious is misconceived and speculative, and the fact that the settlement obligations resulting from the trades cancelled each other out does not make the trades themselves fictitious.

7. The Authority has misunderstood the purpose of a DCAS and hence has reached incredible conclusions and attributed to it a meaning which is not supported by the document itself. The DCAS, produced for clients at the clients' request, is simply a document which a custodian creates, so that clients have basic information about holdings/ dividend credit recorded in the custodian's internal system.

8. It is important to understand the context against which DCASs were produced. The Trading Strategy was not a mechanism for producing DCASs and the Danish Tax Authority itself does not allege this. The DCAS did not "certify" anything. What the DCAS represented to the Client was correct: it reflected the number of shares

---

[3] [2023] EWHC 590 (Comm) [the preliminary hearing known as "the Validity Trial"].
[4] See paragraph 4.40 of the Decision Notice.

internally recorded against the Client's account, the gross and net dividend credited to the Client's account and the tax amount. This was consistent with the entries in ISL's internal records. In addition, the DCAS did not contain any wording to the effect that the Clients owned the securities as a matter of Danish law, or that tax has been deducted from a dividend which has been paid to the Client. No evidence has been produced by the Authority that the Clients were under any misapprehension as to the content of the DCAS. The Authority has at no point made criticisms of ISL's systems and controls. Hence, no criticism can be made of the fact that the DCAS reflected the position within ISL's systems and controls.

9.  It was the tax reclaim agents, and not ISL, who submitted the DCAS to the Danish Tax Authority as part of a package of material sent to it when making an application for a refund of Withholding Tax. There is no evidence from the Danish Tax Authority to suggest that it relied on any records produced by ISL when determining the applications for a tax refund, let alone the DCAS. Accordingly, the assertion that the Danish Tax Authority relied on the DCAS when granting the application for a refund of Withholding Tax fails. In addition, the Authority has produced no evidence that the Danish Tax Authority interpreted the DCAS in the same manner as the Authority, and the Authority's interpretation of the DCAS is irrelevant; it is not a specialist tax body, and it was not the body to whom the tax reclaim agents sent the DCAS. In failing to obtain such evidence from the Danish Tax Authority, the Authority's case on the DCAS is speculation.

10. **Mr Teraiya appears to have misunderstood the Authority's case.  The applications to the Danish Tax Authority are properly described as "inappropriate" because they were made on the basis of misleading information. The questions as to whether or not the applications for Withholding Tax were fraudulent, and whether or not the Trading Strategy was lawful, are beyond the scope of this Notice and do not need to be determined by the Authority in order to conclude that Mr Teraiya acted dishonestly and without integrity. The Authority considers that Mr Teraiya acted dishonestly and without integrity in the conduct of ISL's business, including by knowingly authorising ISL's misrepresentations in the DCASs as to its Clients' holdings of shares, dividends received and tax withheld.**

11. **The Authority's position is entirely consistent with the decision in *Skatteforvaltningen v Solo Capital Partners LLP (in special administration) and others*[5]. This case established the legal principles under which a valid refund can be made. The judgment sets out examples of trading patterns[6], and the Authority considers that the discussed examples cover the same type of arrangements detailed in this Notice as the Purported Trading. The Authority considers that, on the High Court's analysis, the Clients were never Danish shareholders as the result of any of the Purported Trades; none of the Clients received any rightful dividend as a result of the Purported Trades; and the Purported Trades, which netted to zero with respect to both securities and cash, were indistinguishable from trades which cancelled one another out. They were not genuine trades.**

---

[5] ibid
[6] At paragraphs 279-281.

12. **The Authority accepts that it is possible that some legitimate trades between parties who use the same custodian can be net settled[7]. However, the issue is not that net settlement is abnormal but that net settlement as the result of a "self-balancing loop"[8] in which none of the participating parties held shares at the outset of the transactions cannot result in share ownership. Neither can it result in entitlement to a real dividend which gives the recipient rights against the issuer of the securities.**

13. **The DCASs were inaccurate and misleading: the DCASs issued by ISL purported to certify that the US Pension Plans owned the specific number of shares there set out when Mr Teraiya knew there was no proper basis for ISL to assert that its Clients owned the relevant shares[9]; the DCASs set out that the Client had received a specified sum as share dividend when Mr Teraiya knew no share dividend at all had been received[10]; and the DCASs set out that a certain sum had been withheld from the dividend concerned as Withholding Tax when Mr Teraiya knew that no such tax had been withheld from ISL's Clients[11].**

14. **The Authority has not misunderstood the purpose of the DCAS: the Authority's case is not that it failed to contain sufficient information; it is that Mr Teraiya knew that ISL held no shares and no money on behalf of its Clients, because he knew that ISL held no shares in its only active sub-custody account. The Trading Strategy was a mechanism for the application for Withholding Tax and the application required the production of a DCAS. In addition, the Authority considers that it is not necessary to analyse Danish Law to determine the entitlement of US Pension Plans to a tax rebate, or assess the interpretation of the DCAS by the Danish Tax Authority in the way Mr Teraiya has suggested, in order to establish that Mr Teraiya was dishonest in misrepresenting the Clients' holdings of shares and money in the DCAS. The Authority has discharged its burden to prove the facts and matters in this Notice.**

Disclosure and Limitation

15. Mr Teraiya's case on limitation is intertwined with the Authority's failure to comply with his reasonable disclosure requests. The Authority has acted unreasonably and unlawfully, which has had the effect that Mr Teraiya is hampered in his ability to properly defend himself. The Authority submitted that it was not obliged to deal with the disclosure requests, because it would amount to "an audit" of its disclosure exercise. This position does not reflect the obligations on the Authority under the Act, and nor is it consistent with the public law duties to which the Authority is subject. Those public law duties, in particular, require the Authority to act with due candour. The Authority has a common law duty to disclose material which assists a party's

---

[7] See paragraph 118: "By definition, a net settlement, necessarily involving two or more otherwise separate transactions, involves treating the transactions as performed without delivery of all the securities otherwise required to be delivered and/or without making all cash payments otherwise required to be made".

[8] See paragraph 281: "the self-balancing loop of trades has been cash settled. The Danish tax law result of that…. is that the trades would fall to be treated as financial contracts under which no shares were in fact delivered, so no shareholding was ever acquired for tax purposes".

[9] See paragraphs 4.57-4.60 of the Decision Notice (Ownership of shares).

[10] See paragraphs 4.61-4.62 of the Decision Notice (Receipt of dividend).

[11] See paragraphs 4.63-4.64 of the Decision Notice (Payment of tax).

case. This is particularly so in the case of a limitation point[12]. The Authority's approach to disclosure is not consistent with how a public body should behave. It is also counter to the Upper Tribunal's judgment in *Seiler and others v Financial Conduct Authority*[13] which stated that the Authority should ensure that all relevant matters are placed on "the table" and that "all relevant material" is provided to the subject under investigation.

16. Discrete and appropriate disclosure requests were made to the Authority, including examination of staff members' email inboxes and the provision of a sample of information that a regulated broker provided to the Authority. These requests were not responded to, or satisfactorily responded to, by the Authority. In so far as the Authority has purported to review the material which Mr Teraiya has requested it to review, the conclusions it has reached are clearly incorrect in terms of complying with its disclosure obligations. It is also clear from the disclosure in the SKAT Litigation that the Authority holds information, which is relevant to the limitation issue, but which it is wrongly refusing to disclose to Mr Teraiya.

17. The Relevant Period is said to run from 3 March 2014 - 29 January 2015. The Authority is time barred from pursuing any allegations of misconduct which took place on or before 24 July 2014 pursuant to section 66(4) of the Act[14] [15].

18. Since 2010, the Authority has been aware from its interactions with Mr Teraiya that ISL's activity was based around equity finance and stock loans, with its highest level of activity being during the dividend seasons. The Authority has also been aware of the professional connection between ISL and one of the Dubai Individuals since 2010. ISL carried out the necessary transaction reporting to the Authority and accordingly the Authority has had the material information relating to the Cum-Dividend Trading since 2014. It was therefore not only on notice that these transactions had taken place, but it would also have had information as to the price, volume, date of execution and venue. No concern was raised by the Authority at this time. Taken into account with the fact that the Authority had been aware since 2010 that ISL's activities peaked around the dividend season, it had knowledge of the matters about which it complained in the Warning Notice (and repeated in this Notice). In addition, a regulated broker would also have undertaken trade reporting.

19. In or around 2014/2015 the Authority investigated the fact that (consistent with, inter alia, the transaction reporting that ISL had provided to the Authority) ISL had been involved in Cum-Dividend Trading. In August 2015, following co-operation between the Danish Tax Authority and the Authority (which it is to be inferred took place prior to this date), the Authority provided information to the Danish Tax Authority.

---

[12] See Forsyth v Financial Conduct Authority and the Prudential Regulation Authority [2021] UKUT 0162 (TCC) (para 25); https://assets.publishing.service.gov.uk/media/60e45bea8fa8f50c6f050b27/Forsyth_decision_for_release.pdf

[13] Seiler and others v Financial Conduct Authority [2023] UKUT 00133 (TCC); https://assets.publishing.service.gov.uk/media/648836cab32b9e0012a96653/Seiler__Whitestone_and_Raitzen_v_The_FCA_Decision_for_release_to_Parties.pdf

[14] Section 66(4) of the Act: *the Authority may not take action under this section after the end of the [relevant period (see section 66(5ZA)] beginning with the first day on which the Authority knew of the misconduct, unless proceedings in respect of it against the person concerned were begun before the end of that period.*

[15] Section 66(5ZA) of the Act came into force was 25 July 2014. Therefore, misconduct before this date is subject to a limitation period of 3 years; misconduct after this date is subject to a limitation period of 6 years.

20. The Authority visited ISL's offices on 26 November 2015 and spoke with Mr Teraiya (via video call). In the course of that visit, in addition to speaking to Mr Teraiya, the Authority obtained further information from ISL, including the provision of DCASs for the equity transactions, which related directly to the trading activity that had taken place in 2014 and the Clients who had engaged in the Danish Trading.

21. At this time the Authority was also aware of the purported unusual trading patterns, as the Authority had the transaction monitoring real time information which showed that the Clients were on both sides of the trades and that large volumes of shares were being traded. The Authority therefore had information from which the misconduct in the Warning Notice could reasonably be inferred. The Authority had already by this time formed a view that Mr Teraiya may not be fit and proper and that there was a disconnect between ISL's permissions and the Cum-Dividend Trading that took place in 2014.

22. The Authority was already of the view that the volume of the trades was suspicious, stating that it would get its "specialist team" to look into it. Further information was requested by the Authority on 1 December 2015, including full trading history in Danish stocks since ISL's authorisation and details of dividend tax reclaims in Danish stocks, and this was provided by ISL to the Authority on 8 December 2015. The Authority had, over the period 2014/15 – 2016/17, gathered considerable information and had given detailed consideration to the role of various entities including ISL in the context of the Danish Trades. This is also confirmed by the Authority's own document, Market Watch 52, published on 2 June 2017[16]. This document made it clear that the Authority had looked at the activities of, inter alia, "*custodians involved in trading European equities around ex-dividend dates*" including "*custodians issuing tax vouchers*" and that the Authority has "*assessed firms' provision of custody services to clients involved in dividend arbitrage*".

23. By at least 2 June 2017 (if not earlier) the Authority had sufficient evidence from which the misconduct it alleges against Mr Teraiya could be reasonably inferred[17].

**24. The Authority has fully complied with its statutory disclosure duties.**

**25. The Authority's disclosure obligations, which apply to the giving of the Warning Notice and this Notice to Mr Teraiya, are set out in section 394 of the Act. This requires the Authority[18] to allow the recipient of a specified statutory notice access to the material on which the Authority relied in taking the decision which gave rise to the obligation to give the notice; and allow the subject access to any secondary material which in the Authority's opinion, might undermine that decision. Section 394 of the Act does not require the Authority to act with "due candour[19]" as has been asserted by Mr Teraiya; this is a specific duty which applies to all parties in applications for judicial review. In addition, the assertion that there is a "common law duty"**

---

[16] Market Watch: Newsletter on market conduct and transaction reporting issues, June 2017. https://www.fca.org.uk/publication/newsletters/marketwatch-52.pdf

[17] Section 66(5)(a) of the Act: *For the purposes of subsection (4) the Authority is to be treated as knowing of misconduct if it has information from which the misconduct can reasonably be inferred.*

[18] Subject to statutory exceptions.

[19] Due candour requires the parties to assist the Court by ensuring that information relevant to the issues in the claim is drawn to the Court's attention, whether it supports or undermines their case.

to disclose materials which assist a party's case does not reflect the statutory obligation pursuant to section 394 of the Act. In so far as Mr Teraiya is referring to the wider disclosure obligations arising under paragraph 6 of Schedule 3 to the Upper Tribunal Rules 2008, those obligations do not arise unless and until a Decision Notice is issued and the matter is referred to the Tribunal. Until this point, the Authority's disclosure requirements are set out in section 394 of the Act. Accordingly, Mr Teraiya appears to be incorrectly conflating different disclosure obligations.

26. Mr Teraiya appears to have requested that he should conduct an "audit" of the Authority's disclosure exercise. The Authority has carried out an ongoing disclosure review, including with respect to limitation, having regard to the Tribunal's observations in *Forsyth v Financial Conduct Authority and another*[20]. The Authority considers there is no legal basis for Mr Teraiya's request and that it is not appropriate to grant it in circumstances where it has not been provided with reasonable grounds to believe that it has not complied with its section 394 disclosure obligations.

27. The Authority is satisfied that it issued the Warning Notice within the statutory time period to enable a financial penalty to be imposed upon Mr Teraiya. The Authority does not consider that Mr Teraiya's misconduct should be considered to constitute one continuous course of conduct; for example: on each occasion Mr Teraiya oversaw the onboarding of a Client, allowed a trade to clear which was not genuine (or did so himself), authorised provision of a DCAS, or facilitated an onward payment, these occasions should be characterised as separate items of misconduct, capable of being individually penalised.

28. The Authority considers that all the misconduct set out in section 5.3(e) of this Notice, namely, Mr Teraiya's instruction of the provision of DCAS to the Investment Managers, post-dated 25 July 2014; and the six-year limitation period applies to the misconduct set out in sections 5.3(b), 5.3(c) and 5.3(d) where the instances of misconduct post-dated 25 July 2014. Mr Teraiya's submissions on the Authority's ability to impose a financial penalty do not, therefore, apply to his misconduct on or after 25 July 2014[21] as the Warning Notice was given to Mr Teraiya on 4 June 2020.

29. In the case of *Jeffery v The Financial Conduct Authority*, the Tribunal stated: "It is not sufficient that the Authority has information in its hands that would give rise to a mere suspicion. Nor is it enough that the information might suggest that there was misconduct, but that the person in question has not been identified as the apparently guilty party. The Authority must either know or be treated, by reasonable inference, as knowing of the misconduct by a particular person. The reference in section 66(4) [of the Act] to "*the* misconduct" [the Tribunal's emphasis] clearly refers to the particular misconduct in respect of which action is to be taken against a particular person, and not to conduct of a similar nature in respect of which information may have been obtained earlier."[22]

---

[20] ibid

[21] Section 66(5ZA) of the Act.

[22] Andrew Jeffery v Financial Conduct Authority (paragraph 334) FS/2010/0039.
https://assets.publishing.service.gov.uk/media/5752d271ed915d3c89000024/Andrew_Jeffery.pdf

30. Knowledge of the "particular misconduct" in respect of which action is to be taken against a "particular person" therefore means, in order for the "limitation clock"[23] to begin running, that the Authority has sufficient information to infer: (i) that it was Mr Teraiya, and not another employee or director of ISL, who had committed the misconduct in question; and (ii) that Mr Teraiya committed the misconduct specified in the Warning Notice (and repeated in this Notice).

31. "Particular misconduct" means not just the specific acts and omissions of that misconduct, but also the state of mind accompanying those actions. The subject's state of mind is one of the relevant facts which underpins the finding of a Statement of Principle 1 breach, and is an essential fact to be inferred if the Authority is to reasonably infer the particular misconduct set out in the Warning Notice (and repeated in this Notice).

32. In relation to the culpability of individuals, DEPP 6.2.7G states that: "[...] disciplinary action will not be taken against an approved person performing a significant influence function or a senior conduct rules staff member simply because a regulatory failure has occurred in an area of business for which he is responsible." Regarding a breach of the Statements of Principle, APER 3.1.4G provides: "An approved person will only be in breach of a Statement of Principle where he is personally culpable". Accordingly, mere knowledge that a person was involved in the area of a firm where regulatory breaches appear to have occurred is insufficient in itself to draw a reasonable inference that the individual was guilty of the particular misconduct, and therefore would not be sufficient in itself to trigger the time limit under section 66(4) of the Act. Although Mr Teraiya was the Chief Executive of ISL during the Relevant Period, this in itself is insufficient for the purposes of section 66(4) of the Act; personal culpability is required.

33. The Authority considers that it was no earlier than 12 June 2017 that the Authority might first be considered to have had enough information to infer that Mr Teraiya personally understood, at the time of the trading, that it was not genuine, and therefore that he lacked integrity. That is the date of ISL's response to the Authority's first information requirement made after ISL was placed under formal investigation.

34. In that response ISL explained, and defended, the 'netting off' principle (i.e. the Purported Trading), in respect of which Danish equity trades could purportedly be completed without any need for the movement of shares or money. By 12 June 2017, Mr Teraiya was the only remaining employee at ISL who had been involved with the Cum-Dividend Trading, and the most senior, so it would be reasonable to infer that the response came from him. His knowledge of this point is a crucial component of the Authority's conclusion that Mr Teraiya understood that there were no genuine trades, and that he sufficiently understood the other aspects of the Trading Strategy (up to and including the reclaiming of tax) to understand that it was based on a false premise, and that his conduct in relation to it lacked integrity.

35. ISL's response to the first information requirement was also the first point that the Authority could have reasonably inferred that Mr Teraiya personally understood that the Clients were not capable of funding the Cum-Dividend

---

[23] i.e. the first day on which the Authority knew of the misconduct (section 66(4) of the Act).

Trading, and completing the trades, given the purported reliance on the "netting off" principle.

36. **The particular misconduct here is not that Mr Teraiya authorised or instructed the provision of DCASs; but that he did so knowing that the details in the DCASs were false, specifically that no dividends were received by the Clients and the tax purportedly being withheld was non-existent. The point at which the Authority knew of the misconduct[24] (i.e. the Authority having information from which the misconduct can reasonably be inferred[25]) was no earlier than 12 June 2017.**

37. **The Authority received information in a piecemeal manner over an extended period. This included ISL's transaction reporting as mandated under the then MiFID[26].  The Authority's visit to ISL's offices and the telephone conversation with Mr Teriaya on 26 November 2015 came about because the Authority was concerned with ISL's involvement in suspicious trading activity. Mr Teraiya was asked by the Authority why the Clients were taking both sides of the trades at exactly the same time, date, amount and price. Mr Teraiya said that "*he had no idea and that these deals were just a small percentage of the clients*". Mr Teraiya could "*not elaborate on the mechanics of the trading*". He also said that "*as CEO he had other responsibilities and was involved in lots of other matters and that the trading strategies were the clients' strategies*". The Authority considers that this was a clear misdirection in relation to his own personal culpability. Mr Teraiya also suggested that another senior individual at ISL would be in a better position to explain any unusual trading patterns as he oversaw the trade reporting.**

38. **Even if there may have been grounds to suspect that the trading was illicit and Mr Teraiya had some involvement, prior to 12 June 2017, the Authority did not know, and did not have information from which it could reasonably infer the extent of Mr Teraiya's personal culpability in the misconduct by ISL, particularly as before that date it was not clear who had directed the suspect trading activity.**

39. **There is no statutory requirement, pursuant to section 56 of the Act, for the Authority to make a prohibition order within a set time period if it appears to it that an individual is not a fit and proper person.**

Unfair treatment

40. A body performing a public function, such as the Authority, will generally have a duty to perform its function fairly and consistently. In addition to this general duty, the Authority must not subject a party to unfavourable treatment by virtue of their race. The Equality Act applies in the context of a disciplinary investigation and the Authority is subject to the Equality Act and must act in accordance with it at all material times. The Authority is also subject to the Public Sector Equality Duty (PSED). Race is a protected characteristic[27] and a person discriminates against another if, because of a protected characteristic, it treats that person less favourably than others[28].

---

[24] Section 66(4) of the Act.
[25] Section 66(5) of the Act.
[26] Markets in Financial Instruments Directive.
[27] Section 9 of the Equality Act.
[28] Section 13 of the Equality Act.

46

41. A party who believes they have been discriminated against must be able to point to a *comparator*, and on a comparison of cases "there must be no material difference between the circumstances relating to each case"[29]. The Authority is a qualifications body[30] and, in initiating and continuing enforcement proceedings against him (which includes but is not limited to issuing a Warning Notice which seeks to impose a prohibition order and a financial penalty), the Authority has discriminated against Mr Teraiya on the grounds of his race (he is Indian), as he has been treated less favourably than two comparators: Comparator 1 and Comparator 2.

42. Comparator 1 is of Caucasian origin, and was the Chief Executive of another Custodian, Custodian A. Custodian A, like ISL, is a custodian which, inter alia, at the relevant time, issued materially identical DCASs to ISL, and otherwise facilitated the cum ex trades. Like ISL, Custodian A is a defendant in the SKAT Litigation and, as a Custodian, it acted in the same manner as ISL. The Danish Tax Authority (as with ISL) also accuses Custodian A of acting fraudulently. The manner in which Custodian A cleared and settled the trades is materially identical to that of ISL, in that the trades were all netted off and were recorded on Custodian A's internal record system.

43. Comparator 2 is also of Caucasian origin. He was employed by ISL and connected to one of the Dubai Individuals and his firms. Part of his roles were to assist and prepare DCASs. He provided consultancy services for Custodian A and subsequently set up his own custodian, Custodian B, the sole purpose of which was to clear and settle cum ex trades. Comparator 2 was heavily involved in the cum ex trades, arguably more so than Mr Teraiya.

44. It appears that no action has been taken by the Authority against Comparator 1 and/or Custodian A and Comparator 2.

45. The circumstances of Comparator 1 and Mr Teraiya are materially similar. The only material difference between the position of ISL and Custodian A is the identity and ethnicity of their respect Chief Executives. The circumstances of Comparator 2 and Mr Teraiya are also materially similar. The Authority has not provided an adequate explanation as to why they are proceeding against Mr Teraiya but not against white individuals in similar circumstances to him. The only credible explanation for this differential treatment is one of race.

46. In addition to Comparators 1 and 2, the Authority has not taken enforcement action against other Authority regulated Caucasian individuals, despite the fact that they were also involved in the Cum-Dividend Trading, and are involved in the SKAT Litigation (and in some cases arguably more involved than Mr Teraiya). No action has been taken against Caucasian individuals, yet the Authority insists on taking and continuing enforcement proceedings against the only Indian individual.

47. The burden of proof is on the Authority to demonstrate that the reason for the less favourable treatment is not Mr Teraiya's race[31]. The Authority has provided no explanation for the less favourable treatment for his treatment compared with Comparator 1 and Comparator 2 and the other regulated Caucasian individuals referenced above.

---

[29] Section 23 of the Equality Act.
[30] Sections 53 and 54 of the Equality Act.
[31] Section 136 of the Equality Act: *if there are facts from which the court could decide, in the absence of any other explanation, that a person (A) contravened the provision concerned, the court must hold that the contravention occurred. This does not apply if A shows that A did not contravene the provision.*

48. Continuation of the enforcement proceedings constitutes less favourable treatment on the grounds of race, contrary to the Equality Act, and the Authority has failed to discharge the PSED, and on this reason alone, the case should be discontinued.

49. **The RDC is a committee of the Authority's Board and is part of the Authority[32]. It is not a tribunal and makes its decision based on all the relevant information available to it[33]. The RDC is separate from the Authority's Executive and is not involved in conducting investigations or deciding which investigations the Authority should take forward.**

50. **There have been no public outcomes, as at the date of this Notice, into the purported misconduct of Comparator 1, Comparator 2 and/or Custodian A. The RDC has no evidence before it as to: (1) whether investigations were commenced into Comparator 1, Comparator 2, and/or Custodian A; (2) the progress and/or outcomes of such investigations; or (3) the purported misconduct of Comparator 1, Comparator 2, and/or Custodian A.**

51. **The Authority has published investigation opening criteria which sets out factors it considers when deciding to open an investigation, including how the Authority detects and assesses serious misconduct[34]. More detailed information about the Authority's approach to enforcement is set out in the Authority's Approach to Enforcement[35]. Once the criteria under which Enforcement investigates and takes disciplinary action against a subject is satisfied, it is entirely proper for the case to proceed, and the question as to why the Authority may choose to take, or not to take, action against other firms or individuals does not arise in enforcement proceedings before the RDC with respect to this subject of an investigation.**

52. **The discretion conferred on the Authority is not unfettered. The Authority must seek to exercise its powers so as to promote the statutory purpose for which the powers are given. The Authority must direct itself correctly in law. It must act lawfully. It must do its best to exercise an objective judgement on the relevant material available to it. It must exercise its powers in good faith, uninfluenced by any ulterior motive, predilection or prejudice[36]. The Authority is not obliged to investigate every case where the circumstances suggest that misconduct may have occurred. The Authority has finite resources and is in general free to decide how those resources are best deployed[37].**

53. **There is no evidence that the Authority has, inter alia, exercised its powers in an inappropriate way; acted unlawfully; failed to exercise its powers in good faith; or investigated Mr Teraiya unfairly. The RDC has seen no evidence of discrimination, on the grounds of race, against Mr Teraiya and sees no reason to discontinue the case.**

---

[32] DEPP 3.1.1G.

[33] DEPP 3.2.11G.

[34] https://www.fca.org.uk/about/how-we-regulate/enforcement/investigation-opening-criteria

[35] https://www.fca.org.uk/publication/corporate/our-approach-enforcement-final-report-feedback-statement.pdf

[36] R (Corner House Research) v Director of the Serious Fraud Office [2008] UKHL 60 at para 32.

[37] R (Julien Grout) v Financial Conduct Authority [2015] EWHC 596 (Admin) at para 36.

54. **The RDC is required to consider whether, on an objective assessment of the evidence before it, Mr Teraiya has committed serious misconduct, justifying the issue of a Decision Notice, in terms decided by it. The RDC has considered that the evidence before it justifies the issue of this Notice.**

55. **Any concerns that Mr Teraiya has about the Authority's conduct may be pursued by referring the matter to the Authority's Complaints Scheme established under the Financial Services Act 2012.**

Financial Penalty

56. The Authority has asserted that payments made to Mr Teraiya, referenced at paragraph 4.72 – 4.74 of this Notice, were payments made to him for his role in ISL's participation in the Purported Trading, and his role in relaying Tax Reclaim Funds to the First Receiving Entity.  This is incorrect; these transfers were loans provided to him from one of the Dubai Individuals. This Dubai Individual had a close family connection to Mr Teraiya.

57. In addition to the account provided by Mr Teraiya to the Authority, the Dubai Individual produced two affidavits as part of the SKAT Litigation in which they also assert that these transfers were loans.

58. The Danish Tax Authority has accepted that these transfers were loans and the Dubai Individual has given an undertaking to the High Court that "*I will use all reasonable endeavours to seek such recovery [of the loans], including where appropriate and cost effective, by means of legal recourse/enforcement action*". The Authority has, at no point, spoken to the Dubai Individual; and the Danish Tax Authority is in a better position than the Authority to assess whether or not the transfers were loans. The High Court has accepted the Consent Order between the Dubai Individual and the Danish Tax Authority. The Authority has not provided cogent reasons for not accepting the evidence from Mr Teraiya and the Dubai Individual, and accordingly, their evidence should be accepted.

59. The disgorgement figure, at Step 1, should therefore be reduced to remove the loans provided to Mr Teriaya from the calculation.

60. **The Authority considered the possible explanations for the payments made to Mr Teraiya referenced in paragraphs 4.72-4.74 of this Notice, namely, whether they represented Mr Teraiya's remuneration for the Purported Trading and the direct benefit of his misconduct; or whether they were loans provided to him by one of the Dubai Individuals in order for him to participate in investment opportunities and to support a mortgage application.**

61. **Huge profits were made from the Purported Trading. The First Receiving Entity alone received the equivalent of in excess of £35,000,000 of the Tax Reclaim Funds from ISL's client accounts. Payments from the First Receiving Entity to the Dubai Individual personally, following receipt of the above, totalled USD13,610,000. For Mr Teraiya's account to be true, he would have agreed to participate in the Purported Trading for £326,695[38], taking into account the other, considerably larger, benefits for other participants. The Authority considers this is simply not credible.**

---

[38] The sum representing ISL's profits during the Relevant Period (£293,125) plus Mr Teraiya's salary for the Relevant Period (£33,570).

62. The purported loans from the Dubai Individual to Mr Teraiya were not supported by any written agreement and there is no contemporaneous documentary evidence at all that these transfers were loans, other than Mr Teraiya's unevidenced assertions to the Authority. He was unable to give any sensible reasons for the loans, and none of the purported loans has ever been paid back.

63. Mr Teraiya's actions towards these transfers of funds also support the Authority's assessment that the transfers were gifts (and represented Mr Teraiya's remuneration for the Purported Trading). For example, in 2018 he obtained from a UAE bank a mortgage of approximately USD2.5 million on the property in Dubai[39] to purportedly repay the Dubai Individual. Mr Teraiya did not inform this UAE bank that his bank deposits, on which he was relying as evidence of his creditworthiness, were loans. Subsequently, in July 2019, he told the Authority that he had not repaid the Dubai Individual, saying that they had been "*very busy with other things which are taking up more of our time*".

64. The Authority has considered the two affidavits produced by the Dubai Individual as part of the SKAT Litigation. The Authority considers that his evidence needs to be treated with the utmost of caution; the Dubai Individual is a family member and a business associate of Mr Teraiya; a defendant in the SKAT Litigation and the subject of an ongoing freezing order in those proceedings, and accordingly he may not be an objective or independent witness.

65. However, the Authority considers that the account from the Dubai Individual supports its view that these transfers were in reality gifts, and not loans (however they were purportedly described in the affidavits). Notwithstanding that the Dubai Individual uses the term "loans" throughout his affidavits to describe the transfers, he stated that[40] he had not received any monetary repayment, had not pursued Mr Teraiya for any repayment, and did not consider that this loan amounted to an "asset" which it had been necessary for him to disclose to the High Court.  He also admitted that "*whilst, given that the monies were originally as a loan, it may not be formally correct from a legal perspective, in reality from the outset I treated this as a gift to Nailesh and his family, with a view to possible repayment in the future if Nailesh sold the property at profit*".

66. The Authority notes that the affidavits were produced by the Dubai Individual in relation to requests for further information on disclosure arising from freezing orders. The Consent Order simply sets out the decision of the High Court that the Dubai Individual remains subject to a freezing order, with some revision to his legal and living expenses. It does not seek to take a view, or make a finding, as to whether or not the Dubai Individual is truthful or reliable, or whether or not the transfers were loans or gifts. The Authority has taken account of the totality of the evidence and considers that the transfers of payments, set out in paragraphs 4.72-4.74, were gifts (and represented Mr Teraiya's remuneration for the Purported Trading) and not

---

[39] referenced in paragraph 4.72.
[40] as at the date of the affidavit in November 2020.

**loans, and accordingly should be included in the sums available for disgorgement at Step 1.**